and this time we'll hear Victorinox versus B&F System and Locklord. Please the court. My name is Michael Tricarico and I'm with the firm of Carol McNulty and Co. and I also represent the appellant B&F and John Meyer in this matter. This particular appeal relates to the district court's denial of our motion to disqualify Locklord as counsel for B&F in this case. It's clear that there was a concurrent representation where B&F had been a long-standing client of Locklord. Locklord merged with Edwards Wildman. Edwards Wildman was handling this case on behalf of Victorinox. When that merger occurred in January of 2015, there became a concurrent representation where Locklord was representing Victorinox in this litigation and was also representing B&F with respect to certain trademark matters. In issuing its opinion below, the court basically ignored this court's seminal decision, I think, on the issue, which is the GSI case, which is cited in our brief, it's a 2010 decision, and instead appears to apply factors that you are supposed to consider only in the instance in which you don't have a concurrent representation but you have a firm that is seeking to undertake representation against a former client. Like I said, GSI sets forth the standard and... I got a little bit confused about this. Isn't this both a concurrent and a successive representation? Well, I don't think so. I don't think so, Your Honor. I think it... Well, certainly they attempted and did terminate the relationship in 2015, but I think that you can't avoid the consequences of a concurrent representation by merely kicking one client to the curb and saying, now we're going to represent the other client. And I realize it's a district court case, but the Merck case, which was decided in the Southern District, deals with this specific issue, because the fact is there's a lesser standard. It's more easy to... It's easier to disqualify a firm in a case of concurrent representation, and there's a greater inquiry and a higher standard if you're trying to disqualify them in a concurrent representation. So the Merck decision discusses that very issue and says, well, you can't avail yourself of the lesser standard just by kicking the client that you currently have to the curb. Wasn't there a finding on that standard? Wasn't there a finding that the New York lawyers for Lock Lord, who were representing Victorinox, had no information or leakage from Mr. Hardin in Dallas? Well, I don't think that that... I think that that's more of an imputation issue, Your Honor, and I think that it's not really relevant to the inquiry of when you deal with a situation where you have... I think it's imputation. I think the finding was that there was no... They didn't even know. But let me read to you the standard articulated in the GSI case. One established ground for disqualification is concurrent representation, an attorney's simultaneous representation of one existing client in a matter adverse to another existing client. Clearly existed here. The court noted that below. Concurrent representation is prima facie improper. It is incumbent upon the attorney to show at the very least that there will be no actual or apparent conflict in loyalties or diminution in the vigor of his representation. We have noted that this is a burden so heavy that it will rarely be met. Well, let's talk about an apparent conflict of loyalties. Clearly the court in its decision refers to an apparent conflict of loyalties. It notes it on page six and said basically Mr. Hardin, the attorney who had represented BNF for a long period of time, acknowledged that there was an apparent conflict. Now let's talk about the actual conflict in loyalties. While this concurrent representation was going on, BNF was submitting briefs stating basically some of the things that you heard in the prior argument today that's being heard in tandem with this one. And these are the things it said about its own client in a concurrent representation situation. It said defendants are confirmed counterfeiters committed to a continuing nefarious enterprise. Defendants are willful counterfeiters. They have engaged in a pattern of deception. Defendants are documented serial infringers. Defendants acted in bad faith. Defendants' willful infringement and deceptive conduct evidences a complete lack of respect for the judicial process. If that isn't an actual conflict in loyalties, I'm really not sure what is. Returning to my colleague's question at the start, that's happened already. It might have been a reason at the beginning to say you shouldn't be doing this concurrent representation. It unwittingly went on. Is it now a reason for disqualification if there's no exchange, if there's a finding by the district court looking at that standard? There was no confidential information exchange. This team that is currently litigating this is aware of no private information. Well, we don't know that obviously because we weren't granted full disclosure and discovery on that issue. There was some testimony at a hearing and we did get a document production of some limited emails and we were given a very short period of time in which to conduct that discovery. But I think that on that issue, there's a recent case that is cited in Victorinox brief and our brief, but actually not in the intervener's brief, and it's called Prevazon. And it says with respect to revealing confidential information, it says a court should not, that's in the context of representing a former client, but I think the rationale still applies. A court should not require proof that an attorney actually had access to or privileged information. Such a requirement would put the former client to the Hobson's choice of either having to disclose the privileged information in order to disqualify his former attorney, or having to retain from the disqualification motion altogether. So what you're putting in a situation of saying, well, now I'm going to have to prove this. I'm going to have to go and reveal what these client confidences are that exist, what the information is they have. At the same time, Prevazon says that disqualification is the remedy only if there's a tendency to have a taint. Yes, but- Is there any taint? I mean, where would you look for this? Well, it's interesting that you should raise that. Again, the GSI case, it says disqualification is warranted only if an attorney's conduct tends to taint the underlying trial. One established ground for disqualification is concurrent representation. So concurrent representation meets the standard of taint, if that's the applicable standard even in a concurrent representation situation. That's what the GSI decision tells us. Also, what Prevazon tells us is one recognized form of taint arises when an attorney places himself in a position where he could use a client's privilege information against that client. Well, here you have a firm that has been handling trademark matters for years and years and years, over 20 years for this particular client, BNF. And lo and behold, they're in a litigation involving trademarks. The record is clear on this, and it's undisputed. They handled numerous- Is there also a finding that there could not have been the leakage between the Dallas office with Mr. Hardin and the New York office? Well, I don't know, I think that- I don't know what the basis of it is, but I think there's a finding. I think the court said that they took certain steps to prevent that from happening, and there was nothing in the record to indicate that that had actually occurred. But the problem- New York office, as opposed to Dallas office, was password protected, and the Dallas people didn't know the New York- Again, that is in the record, yes, and there is also, in the record, communications between- But was that disputed? because what that sounds like is that the Dallas people were not able, did not have access to the New York record, and vice versa. I don't think, well, quite frankly, I don't think that that's an issue under GSI. Because GSI, if you look at the lower court decision, involved attorneys. We had one set of attorneys handling the litigation involving the current subsidiary of the current client. And they had no knowledge or information about anything that had gone on with respect to the other aspects of the representation. And the court, it didn't even consider that as a factor, quite frankly. And that's, what's most surprising about the trial court's failure to even discuss the GSI decision is, Judge Rakoff issued that decision, it was affirmed by this court, it's directly on point, you have a concurrent representation. You had facts where the attorneys, where you had different attorneys involved, if you read the trial court opinion with respect to the various matters that they were involved in. And actually, GSI takes it one step further. It's a conflict, not with the actual client, but a subsidiary of the client. So this is very serious stuff, and it shouldn't be taken lightly. And I think that the court, quite frankly, it honestly did that in its opinion. It ignored the equities of the situation also. It found, first, that they had represented parties in a litigation who had engaged in a concurrent representation without getting approval from the client in advance, and in violation of many New York professional rules of conduct. It performed a conflicts check that it knew was not complete. It basically had a- What do you mean by that? Well, it said, we're going to only check conflicts for clients who have provided us with $100,000 in business in the prior two years. And that's, I mean, they had to have known, and their witnesses admitted on the stand at the hearing, that yeah, they knew they weren't going to be doing a complete check because they said they needed to complete it expeditiously so the merger could take place. Is that why this conflict was not picked up? I think that's correct. It's of their own being.  They didn't do an adequate conflicts check. You presume that's- Just one question. Tell me what you think the difference in the elements for consecutive and concurrent representation are. Well, I think one of the clear elements in a consecutive representation is the issue that you have to look into is whether or not the scope of the work was substantially different. I think that's one of the key elements. And what's troubling about Judge Rakoff's finding is he examines that and latches on to that and says that's one of the reasons here that I'm finding that there's no disqualification. He's actually kind of, he's paying lip service to what the actual standard is, but at the same time incorporating elements of the incorrect standard. And all at the same time, completely ignoring the GSI case, which as we said, is almost directly on point here and is his own decision. Thank you. Thank you. Good afternoon, your honors. Philip Tweetu from Hinshaw and Culbertson for the intervener, Locke Lord. We appeared below at the hearing before Judge Rakoff and were granted leave to intervene on this appeal. I'm going to start with an important point. Locke Lord acknowledges that it has an ethical obligation to conduct a search for conflicts of interest. Let's start with that basic premise. It does not dispute that its pre-merger conflict check was less than perfect. Locke Lord heard well and clear what Judge Rakoff had to say, both at the hearing where it produced witnesses and in his decision. But an imperfect conflict check does not to compel the conclusion that the appellants are advocating here, that a disqualification is mandated. As Judge Jacobs noted in his opinion in 2009 in the Murray case, disqualification is a extreme remedy. Other courts have described disqualification as disfavored. Okay, we'll start with those basic premises. In every case of disqualification- That is because there are other avenues of discipline in the state system. And that is correct. And what we are here to do today is to determine whether a law firm should continue to represent a client in an active matter. This is not a disciplinary proceeding. Yeah. The law in Hempstead and all the court's prior decisions make that point explicitly clear. In every case of disqualification in this circuit, whether it be one arising from a concurrent representation, a former representation, a corporate affiliation, or as this court most recently considered, a non-party representation, it boils down to one important question. Is there a substantial risk that a client's confidential information will be used by an attorney in a manner that's harmful to that client? That's the issue. If there's no substantial risk, the court has consistently declined to disqualify.  At the hearing below, Lock Lord submitted uncontroverted evidence that there was no substantial risk that Lock Lord had access to the appellant's confidential information at a point in time when it was meaningful. That's important. Throughout these cases, the courts have always considered what is the timing of the alleged access relative to a determination on the merits. It's undisputed in this case that by the time the Edwards-Wildman firm merged with Lock Lord on January 12th, 2015, its motion for summary judgment on behalf of Victoria Knox had already been submitted for decision. The evidence supporting that motion was developed by Edwards-Wildman well before the merger. Further, as the timeline of events shows, after carefully considering the evidence, Judge Rakoff issued his bottom line decision, ordering summary judgment 10 months before this merger. These are facts that are markedly different than the cases where the court has ruled in favor of disqualification. The appellant cites GSI, but in GSI, for example, the motion for disqualification was made before any decision had been reached on the merits of whether Baby Center had breached its e-commerce agreement with GSI. It's at the beginning of the case. In that case, it was argued by GSI that Baby Center had waived the conflict of interest under the terms of the engagement agreement. There wasn't any submission of evidence with regard to access in GSI, and the court didn't discuss that issue. Case is not relevant here. This court disagreed that there was a clear waiver in the GSI case and affirmed the lower court's decision. In doing so, it found, and this is the point, that GSI had, quote, failed to adduce any evidence to rebut the presumption of trial tame. There are no set of facts in this circuit that mandate an order of disqualification. Each case is considered based on the evidence. Where does that presumption of trial tamed come from? What creates that presumption? That's a reference to the rules of professional conduct, which are, it's intended to. Why doesn't that presumption apply here? The presumption, the presumption, the question is whether the presumption's rebuttable or not. The presumption applies here, and I think that Judge Rakoff applied the presumption, but he also was open to considering evidence to rebut that presumption, and that's what occurred here. The court took in evidence, had a hearing, and determined that the presumption had been properly rebutted. Thank you. Yeah. It's not, not since Hempstead video has it been the law in this circuit that a presumption of confidence sharing is irrebuttable. That's the law in this circuit. We didn't hear once during the appellant's presentation the governing law in this circuit. Governing law is not GSI. GSI discussed a novel issue that came before the circuit concerning corporate affiliates. This is not a case involving corporate affiliates. The Hempstead video case rejected, in fact, the same sort of per se disqualification rule that's now being urged by the appellant, and decided instead to adopt the rebuttable presumption procedure that we just talked about. What disturbs me is that this, you know, what we have here is, it seems to me to be an especially egregious violation of professional responsibilities, and why can't that, in and of itself, constitute a taint? I mean, here you've got your firm leveling these very, very serious accusations against a client whom you are ethically bound to defend zealously within the bounds of the law. I mean, if we accept your, what seems to be somewhat relaxed standard, I'm not sure where we would be going. Well, I understand the court's concerned about a slippery slope. This is not a case where we're going to set a new standard for disqualification motions. I'm not looking to set any new standards. It would be a new standard in this circuit if we were to say, because of an egregious error in a conflict check, we are going to now automatically disqualify law firms. The reason the circuit has— I mean, it's more than that. When you found it out, you weren't candid with your clients. You just sent the files back. If you take a look at Roy Hardin's testimony, which the court below found credible, he explained himself. He did draft that letter to BNF, and he said in his mind it wasn't clear to him whether there was a conflict, and he offered a good reason for that. Not credible. Judge Rakoff found otherwise, and there's a reason for it. He said that under Texas's conflict rules, there is a circumstance where there can be a concurrent representation of parties that are adverse to each other. Now, that's Texas's rule. Now, the Deputy General Counsel also appeared before Judge Rakoff and said as a matter of firm policy, they do not rely on what we call below the Texas rule, Rule 1.6. But he tried to explain that Mr. Hardin's state of mind was informed by that rule. The man was a lawyer in Texas for 40 years, and he wasn't sure whether that was a conflict. He also said, interestingly, that shortly after he sent his letter, which didn't say that it was. It's very hard to believe. I spent almost as much time on your side of the bench as this one, that an experienced, intelligent, smart lawyer would equivocate as to whether these circumstances present a conflict. It doesn't seem to me . . . You're not helping your case with me by suggesting that there's ambiguity about whether there's a conflict. I'm not here to suggest that there's an ambiguity. All I'm suggesting is that Mr. Hardin had a particular set of rules in mind when he decided to send that letter. He said very candidly before Judge Rakoff, if I had a chance to do it again . . . Well, I'm paraphrasing him, but if I had a chance to do it again, I might have said more. And I think that that was credible. He would have said more. But the question here is, should Locke Lord be disqualified? That's really where we are. If a disciplinary body should take a look at this, we'll have other things to talk about, perhaps. But here, the question is really whether Victoria Knox should continue to be represented by a law firm and a group of lawyers that had no access, no ability to even get access to information concerning BNF. In fact, it's kind of ironic that the appellant points to the very vigor in which the arguments were presented. What was the point of having the electronic wall? The point of the electronic wall was Locke Lord, unfortunately . . . Unless you were concerned that there were conflicts, why would you have the electronic wall? The electronic wall was implemented after the merger and after a discovery that the firm was representing BNF. They did the proper thing by saying, well . . . Was the wall only directed at BNF's files, or was it firm-wide? It was meant to insulate the Edwards-Wildman, the legacy Edwards-Wildman team, from everything that the firm may have had in its electronic database pertaining to BNF. But it was BNF-specific. Is that what you're saying? Absolutely. Absolutely. That was its intention. In the record, there's a notification that went out to the entire firm, or at least to the Edwards-Wildman team, saying none of the BNF legacy files, most of which the paper files had already been shipped back to the client . . . I had understood that the division was sector-specific, not client-specific. That the New York firm, as it was, would have a division with the Dallas firm, as it was, in order to avoid maybe the kinds of conflicts that would arise for under $100,000 representations. I don't think I understood that it was specifically instituted because there was an awareness of this simultaneous representation. The wall was erected in February of 2015 when it came to light that there was this representation of BNF. Oh, I see what you're saying. So, you know, the firm, while it would have, you know, in retrospect, have done it earlier . . . The two did not know that the other represented, you know, the other client. There was that moment . . . there was a period of time where there was no knowledge. When was the electronic wall implemented? So, it was . . . after the merger, I believe it was February 18, 2015. Right. The conflict . . . well, Mr. Hardin's letter went out in December, I believe. I'm sorry, December 2015. The wall was implemented in February 2016. So, prior to 2016, we don't know who looked at what firms. Well, the evidence shows in the record and the court below accepted that it was physically impossible for the two to connect. The document management systems of the two firms remained separate. There's no evidence that anyone talked to each other. The declarations make affirmative statements that they did not talk to each other. For most of the period of time that we're talking about, the two did not even know that they were representing clients that were adverse to each other. I might be able to clear some of this up, having lived through it. That would be very good. First, I just want to indicate that I don't think the integrity of the adversarial process has been affected or compromised by anything that's been done in this case. We've had . . . we lived through a merger. We had separate IT systems. We were in separate offices. Literally, in New York, we were in separate offices from the Lock Lord offices for a year. There was no way we were even communicating on that basis. Our systems could not get into any other systems in Lock Lord. They couldn't get into ours. Once it occurred that there was an ability to do that, which is much later. It's probably late last year. We needed access codes to get in, and we didn't want them. We didn't have them. Also, on this screen that went up, it went up right after I notified the general counsel's office that this motion had been made, so that we could immediately put up a screen, because I had no clue, up until the day before the motion was filed, that we even had a conflict when I received a call from Mr. Tricharico. I think in terms of the de facto wall that was created just by virtue of the fact we had two different firms with two different systems, we were in two different locations, we were definitely even geographically distant in New York, that it was impossible to have any communications that we did. I can say to the Court, we did not have any communications. No confidential privilege, nothing has ever transpired. In terms of the screen, I think the screen went both ways. Mr. Hardin, the people that were going to be in it, couldn't get into the Victorinox documents either, so it worked both ways in terms of doing that. I just want to talk a little bit about Victorinox, because they're the ones in the middle here. Victorinox will be very prejudiced at this stage in this case, will suffer an unwarranted injury and cost if they're disqualified. Victorinox wants to continue with and does not want to lose its outside IP counsel, who have represented them for over 20 years, and particularly knows the intricacies of this case, and also the intricacies of their history, in a sense. So that's basically what I wanted to raise for my two minutes, and I'm willing to take any questions. But I just want to reiterate that we were totally separate in every way, and it's an unfortunate circumstance, but we merged, and that's where we are. Thank you. Thank you, Judge. We'll hear rebuttal. Well, first, Your Honor, I'd like to address Mr. Twitu's comments about the letter that Mr. Hardin sent to his former client when he was terminating the relationship with BNF. The court found that letter to be misleading on its face, and Hardin conceded in his testimony the letter conveys only that Lock Lord is terminating its relationship with BNF for economic reasons. However, as Mr. Hardin also admitted, Lock Lord terminated the relationship with BNF not just for economic reasons, but also because of the apparent conflict. So, you know, here, Your Honor, Mr. Ratting talked about the equities involved in this case. Well, let's talk about those a little bit. Here we have a firm that, by its own admission, conducts an insufficient conflicts check, puts in procedures to protect against who knows what's going on. I think when Mr. Ratting was talking about some of the equities, he was saying that his client has a big interest in the outcome of this. This is not just a collision of ethical positions and law firms, but his client has invested in a very substantial representation over a very long period of time and wonders why that would be severed or interrupted based upon something in which nobody can prove any real harm. That's of their own making, Your Honor. I mean, they clearly were delegatory in what they were supposed to do to protect against conflicts. Let me grant you that. The point I'd like you to address in your remaining time is how did that affect the litigation, this litigation? How did it taint it? Well, again, Your Honor, I think we get to the, maybe it's semantics, but I think the GSI opinion tells you once there's a concurrent representation, that's a prima facie existence of taint. And the lawyer who would sue his own client asserting in justification the lack of substantial relationship between the litigation and the work he has undertaken to perform for that client is leaning on a slender read indeed. Here what we have is a situation. Is there a position that we really need to know nothing more than the concurrent representation? I think the case law is very clear. I think GSI is very clear. Once you have concurrent representation, it's prima facie improper. You're quoting from Judge Rakoff's opinion. No, I'm quoting from the circuit court's affirmance of Judge Rakoff's opinion. It was a trial court opinion by Judge Rakoff, which discusses more of the facts of the case, and then there is a second circuit decision directly on point, which discusses this issue. But I wanted to just address the equities on that last point. If the court affirms the lower court's decision, basically what it's telling firms is that you can engage in a concurrent representation of two clients without disclosing it and getting prior approval, two, conduct a woefully inadequate conflicts check, and then three, basically mislead your client as to the reasons for which you're terminating the relationship. And on top of that, all those circumstances exist, and guess what? You know what? You are required to pay the attorney's fees of the firm that's making all these allegations against you and engaged in this reprehensible conduct, which is really what it is. The court discussed it as negligent or even grossly negligent below. So basically, you'd be sanctioning a situation where they do nothing right, and on top of that, they're entitled to recover attorney's fees from BNF in this case? The equities just don't support that. Thank you. Thank you all. We'll reserve a decision. That's the last case on calendar. Please adjourn the court. Court is adjourned.